Filed 2/26/21  P. v. Jackson CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSEPH LORENZO JACKSON,<br><br>    Defendant and Appellant. | D076819<br><br><br>(Super. Ct. No. SCN399995) |

APPEAL from a judgment of the Superior Court of San Diego County, David G. Brown, Judge.  Affirmed in part, reversed in part; remand for resentencing.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

A jury in August 2019 found defendant Joseph Lorenzo Jackson guilty of two counts of using personal identifying information of another (Pen. Code,[1] § 530.5, subd. (a); counts 1 & 4); two counts of uttering, passing, and publishing a fictitious and altered check, and identity theft (§§ 473, subd. (b) & 476; counts 2 & 5); and two counts of forgery of a name and identity theft (§§ 470, subd. (a) & 473, subd. (b); counts 3 & 6). Defendant committed counts 1–3 on April 6, 2019, and counts 4–6 on April 15, 2019. Defendant subsequently admitted one prior strike (§ 667, subds. (b)-(i)) and three prison priors (§ 667.5, subd. (b)).

In September 2019, the court sentenced defendant to prison for 10 years four months, consisting of six years for count 1 (the upper term of three years, doubled for the strike prior); a consecutive term of 16 months for count 4 (eight months—one-third the midterm, doubled), plus three consecutive one-year terms for the three prison priors. The terms for counts 2, 3, 5, and 6 were stayed. (§ 654, subd. (a).)

On appeal, defendant contends his convictions on counts 3 and 6 must be reversed because there was insufficient evidence to show he signed the checks at issue—a requirement for conviction under section 470, subdivision (a). He further contends, and the People agree, his three, one-year prison priors must be struck in light of Senate Bill No. 136 because none involved a sexually violent offense as defined in Welfare and Institutions Code section 6600.

As we explain, we agree with both of defendant's contentions. We thus remand for resentencing.

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

2

## FACTUAL BACKGROUND

Stephanie L. testified she was the branch manager of a bank located in Vista, a city in San Diego County. She was working at the bank on April 15, 2019. At some point during the day her lead bank teller reported suspicious activity by two nonbank clients, defendant, and an individual named Shane P., each of whom were attempting to cash a check drawn from the account of Quail Properties Investors Inc.

Stephanie testified that when the bank suspects potential fraudulent activity, their custom and practice is to make a copy of the front and back of the check and the picture identification of the person who presented the check; to contact the fraud unit of the bank; and to compare the check against documents the bank keeps on file. Stephanie also testified as bank manager she has access to all checks that are successfully negotiated by the bank, including at other branches, which checks are kept on file for at least seven years. This includes photocopies of both the front and back of negotiated checks.

Defendant attempted to cash check No. 1013 in the amount of $383.92 payable to "Joseph Jackson." After being alerted by the head bank teller, Stephanie compared her client's signature, either from past negotiated checks or to a signature card on file, to the checks presented by defendant and Shane and found the signatures on each of the two presented checks "were different." Stephanie also discovered defendant on April 6 had cashed check No. 1010 in the amount of $385.19 from the same account but at a different Vista bank branch. She compared the signature on the April 6 check to her client's signature and found the two signatures also did not match.

While defendant and his companion waited in the bank lobby, Stephanie contacted another department of the bank about the potential

3

fraudulent activity, ensuring no other checks from this account were being negotiated at other branches. After making copies of the relevant documentation and alerting the fraud unit(s) of the bank, Stephanie returned to the lobby where the two men had been waiting. Stephanie found both men had left, after one of the tellers had returned their picture identification but not the unnegotiated checks.

The parties stipulated that surveillance cameras from the other bank branch showed defendant on April 6 cashing the check from the account of Quail Properties Investors Inc.; and that the "subject who cashed—attempted to cash two Quail Property . . . Investor checks at two separate [bank] locations was the defendant, Joseph Jackson."

Kenneth F. testified he is the president and CEO of Quail Properties Investors Inc. Other than his fiancée, no other people worked for the company. The company had an account at the Vista bank, and other than Kenneth, at the time of trial no one else was authorized to sign checks from that account.[2] On or about April 15, Kenneth learned the account had been compromised when he received a call from the bank informing him that two men had attempted to cash checks drawn from the company's account. Kenneth told the jury he did not write or sign either check. Later that day, he went to the bank branch and closed the account.

On questioning, Kenneth testified that he also did sign the check that was negotiated on April 6 made payable to defendant; that he did not authorize anyone in any capacity to write or negotiate the two checks made payable to defendant; that he then did not know defendant or a person

---

[2]     Kenneth testified his fiancée at one point had been authorized to sign checks as vice-president of the company, but not in April 2019. In any event, there is no record evidence suggesting her signature was on any of the checks.

named Joseph Jackson; and that as of April 15, he had not hired anyone, including defendant, to work for him or the company that might have been paid by check.

Kenneth recalled sometime in about March 2019 his car was broken into while parked in the driveway of his Vista home. At the time of the break-in, Kenneth then did not realize his checkbook was inside the car and had been stolen, explaining he wrote "very few checks" from that account.

Defendant testified in his own defense. In April 2019, he was working "odd jobs" that were mostly temporary as he found it difficult to find full-time employment because he was a convicted felon. Defendant admitted possessing two checks from the account of Quail Properties Investors Inc.

He testified that he received the two checks from an older "white woman," after responding in early April 2019 to an online post for maintenance work at a Vista apartment complex; that the woman met him at a convenience store in Vista and explained the one-week job; that he followed the woman in his car to the apartment complex where the maintenance work was to be done; that he wanted to be paid $14.50 per hour; and that the woman agreed to these terms and paid him in advance by handing him two checks with different dates drawn from the account of Quail Properties Investors Inc.

Defendant believed the woman was authorized to write the checks. He denied writing either check out to himself, and also denied seeing the woman write out the checks. Instead, defendant testified the two checks were already made out when the woman handed them to him. Because he was being paid "under the table" and ended up working only six of the seven days, he did not question the amount he was being paid for the job, which, according to defendant, "came out to [$]812."

Defendant was asked about Shane and how he too came into possession of a check drawn from the account of Quail Properties Investors Inc. According to defendant, the same woman who paid him also paid Shane for picking up landscaping "debris" at the end of the job.

On April 6, defendant successfully negotiated one of the two checks he had received from the woman. On April 15, defendant went to a different branch of the same bank, signed the back of the check, and handed it to the bank teller along with his picture identification. According to defendant, the teller acted in a way that suggested there was a problem with the check. Defendant testified the teller next called her boss over, and they asked defendant who had signed the check. Defendant responded a female, but testified he then could not remember the woman's name.

Defendant and Shane waited in the bank lobby. A short time later, one of the teller's informed defendant and Shane that their checks were unauthorized and that the bank would not honor them. The teller then returned defendant's picture identification and, according to defendant, attempted to return the check made payable to him. Because he then concluded the check was fraudulent, defendant told the jury he refused to accept the check because he did not want to possess "stolen property."

On cross-examination, defendant could not describe the car the woman was driving when they met at the convenience store and he followed her to the apartment complex. He also could not describe what the woman looked like, including her hair color or its length, her body shape or height, or any other details of her appearance. Defendant also could not explain why the woman paid him in advance with two checks rather than with a single check; how she knew how much he was to be paid considering he ended up working

6

only six of the agreed-upon seven days; or why the woman paid Shane at the end of the job, rather than in advance as she had done with defendant.

Defendant also could not explain why he had promised the woman that he would hold both checks until after the job was completed, but ended up cashing one of the checks on April 6, or one day after he started the job; or why he went to a different branch location to cash the second check on April 15, after he successfully negotiated the first check on April 6 at a different branch; or why he did not attempt to find the woman who gave him and Shane the fraudulent checks in order to get paid for their work; or why he did not report the woman to police; or why he insisted in parts of his testimony that he cashed both checks on May 6, despite the parties' stipulation otherwise, and despite the testimony of branch manager Stephanie, who stated defendant attempted to cash the second check on April 15, after cashing the first check at a different branch on April 6.

## DISCUSSION

A. *Counts 3 and 6*

1. Guiding Principles

As noted, defendant was convicted in counts 3 and 6 of forgery. Section 470, subdivision (a) provides: "Every person who, with the intent to defraud, knowing that he or she has no authority to do so, *signs the name of another person* or of a fictitious person to any of the items listed in subdivision (d) is guilty of forgery."[3]  (Italics added.)

The jury here was instructed as follows with CALCRIM No. 1900: "The defendant is charged in counts three and six with forgery committed by signing a false signature in violation of Penal Code section 470(a). [¶] To

[3]  Checks are included among the items listed in subdivision (d) of section 470.

7

prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. *The defendant signed someone else's name or a false name to a check*; [¶] 2. The defendant did not have authority to sign that name; [¶] 3. The defendant knew that he did not have that authority; [¶] AND [¶] 4. When the defendant signed the document, he intended to defraud.

"Someone intends to defraud if he or she intends to deceive another person either to cause a loss of money, or to cause damage to, a legal, financial, or property right.

"For the purpose of this instruction, a person includes a corporation, business or association.

"It is not necessary that anyone actually be defrauded or actually suffer a financial, legal, or property loss as a result of the defendant's acts." (Italics added.)

As noted, defendant contends there was no substantial evidence that he signed someone else's name or a false name to either the check he successfully negotiated on April 6, or the check the bank refused to honor on April 15. We agree.

To evaluate a claim that a conviction lacks sufficient evidence, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Our focus " 'is on the whole record of evidence presented to the trier of fact, rather than on " 'isolated bits of evidence.' " ' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1329.) " ' " 'If the

8

circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*In re George T.* (2004) 33 Cal.4th 620, 631.) Instead, reversal is required only if " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

Given this deferential standard of review, a "defendant bears an enormous burden in claiming there is insufficient evidence" to support a conviction. (*People v. Veale* (2008) 160 Cal.App.4th 40, 46.) Nevertheless, "substantial evidence," that is, evidence that is " ' "reasonable . . . , credible, and of solid value" ' " is required, not just any evidence. (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1363.) In particular, a reasonable inference from the evidence " ' "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360 (*Davis*).)

2. <u>Analysis</u>

Here, it is clear from defendant's convictions on all counts that the jury did not believe all or part of his testimony, including how he came into possession of the two checks; why the woman—whom he could not identify or describe—paid him in advance with two checks, with different dates and in differing amounts (including in pennies) for a single job; the relationship of the woman and/or the apartment complex to Quail Properties Investors Inc. and/or Kenneth; and so on.

That being the case, the record is bereft of evidence, much less substantial evidence, to support the inference that defendant, as opposed to someone else—including his companion Shane or the older "white woman," signed Kenneth's name to one or both of the checks from his company's account. As noted, defendant testified that the checks were already made out and signed when the woman handed them to him. The prosecution offered no evidence to show defendant signed the checks, including testimony from a person with knowledge of defendant's handwriting (see Evid. Code, § 1416[4]), or from a handwriting expert (see *id.*, § 1418).[5]

We conclude the inference defendant signed one or both of the checks in question in this case was based on " ' "speculation, supposition, surmise, conjecture, or guess work" ' " and not on substantial evidence. (See *Davis, supra*, 57 Cal.4th at p. 360; see also *People v. Sanford* (2017) 11 Cal.App.5th 84, 85 [reversing a defendant's conviction for second degree robbery because

---

[4]    Evidence Code section 1416 provides: "A witness who is not otherwise qualified to testify as an expert may state his [or her] opinion whether a writing is in the handwriting of a supposed writer if the court finds that he [or she] has personal knowledge of the handwriting of the supposed writer. Such personal knowledge may be acquired from: [¶] (a) Having seen the supposed writer write; [¶] (b) Having seen a writing purporting to be in the handwriting of the supposed writer and upon which the supposed writer has acted or been charged; [¶] (c) Having received letters in the due course of mail purporting to be from the supposed writer in response to letters duly addressed and mailed by him to the supposed writer; or [¶] (d) Any other means of obtaining personal knowledge of the handwriting of the supposed writer."

[5]    Evidence Code section 1418 provides: "The genuineness of writing, or the lack thereof, may be proved by a comparison made by an expert witness with writing (a) which the court finds was admitted or treated as genuine by the party against whom the evidence is offered or (b) otherwise proved to be genuine to the satisfaction of the court."

the "crucial inference" that the defendant, who was African-American, was at the scene of a jewelry store robbed by a group of African-American men, and therefore by implication participated in the robbery, was entirely speculative after defendant was found to be riding in one of the two get-a-way cars that was stopped by police about 10 minutes after the robbery, when there was no physical evidence linking the defendant to the robbery, no witnesses who were able to identify him at the scene, and there was uncontroverted evidence one of the cars' occupants had changed between the time of the robbery and the car being stopped by police].)

B. *Newly Amended Section 667.5*

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b) regarding prior prison term enhancements. (See Stats. 2019, ch. 590.) Former section 667.5, subdivision (b) imposed an additional one-year term for each prior separate prison term or county jail felony term, except under specified circumstances. However, newly amended section 667.5, subdivision (b) imposes that additional one-year term only for each prior separate prison term served for a conviction of a sexually violent offense. (§ 667.5, subd. (b); see *People v. Jennings* (2019) 42 Cal.App.5th 664, 682 [noting "[b]y eliminating section 667.5, subdivision (b) enhancements for all prior prison terms except those for sexually violent offenses, the Legislature clearly expressed its intent in Senate Bill No. 136 . . . to reduce or mitigate the punishment for prior prison terms for offenses other than sexually violent offenses"].)

Here, the amended information alleges defendant's first prison prior was for a conviction in 2009 for second-degree robbery (§ 211); his second was for a conviction from 2013 of use of personal identifying information of another (§ 530.5, subd. (a)); and his third was for a conviction in 2015 for

11

grand theft (§ 487, subd. (a).) As noted, the parties agree that defendant's three prison priors were for nonsexually violent offenses. (See Welf. & Inst. Code, § 6600, subd. (b).) Because defendant's case is not yet final, we agree with the parties that Senate Bill No. 136 applies retroactively to defendant (see *In re Estrada* (1965) 63 Cal.2d 740); and therefore, that his three, one-year prior prison enhancements must be stricken.

## DISPOSITION

Defendant's convictions on counts 3 and 6 are reversed. In addition, the trial court shall strike defendant's three, one-year enhancements imposed under former section 667.5, subdivision (b), and resentence him accordingly. Following resentencing, the court shall forward an amended abstract of judgment to the appropriate authorities. In all other respects, the judgment is affirmed.

BENKE, Acting P. J.

I CONCUR:

DATO, J.

J. O'Rourke, concurring in the result:

I concur in the result. I take exception to the majority's criticism of the prosecution for failing to present any evidence pursuant to Evidence Code sections 1416 and 1418. There is no indication in the record that any such evidence exists, and it is entirely a matter of conjecture and speculation that it could have been obtained.

O'ROURKE, J.